**AMERICAN PELAGIC FISHING COMPANY, L.P., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–119C.

United States Court of Federal Claims.

April 4, 2001.

Stephen A. Saltzburg, Washington, D.C., argued for plaintiffs. With him on the briefs was Laurie Frost Wilson, Washington, D.C.

Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, argued for defendant. With her on the briefs were David W. Ogden, Assistant Attorney General, and David M. Cohen, Director.

OPINION

BRUGGINK, Judge.

This is an action founded upon the Takings Clause of the Fifth Amendment to the United States Constitution. Plaintiff asserts that the enactment of legislation resulted in a temporary taking of plaintiff's fishing vessel. Pending are plaintiff's and defendant's cross-motions for summary judgment. Oral argument was held on November 21, 2000. After oral argument, the court requested supplemental briefing. For the reasons set forth below, plaintiff's motion is granted, and defendant's motion is denied.

## FACTUAL BACKGROUND [1]

Plaintiff American Pelagic Fishing Company, L.P., ("APFC") [2] is a limited partnership that invested nearly $40 million in a fishing vessel, a freezer trawler named the *Atlantic Star*, for the purpose of fishing for Atlantic mackerel and herring in the Exclusive Economic Zone ("EEZ") of the United States. [3] The *Atlantic Star*, a United States flag vessel when owned by plaintiff, was 369 feet in length and weighed over 6,900 gross tons. Each of its two engines was capable of producing 6,700 horsepower. The *Atlantic Star*'s size enabled it to contain a larger cold storage facility than other participants in the Atlantic mackerel and herring fisheries. Its size did not, however, mean that it was capable of catching more fish than smaller vessels; a vessel's size does not have a direct relationship to the amount of fish that the vessel can catch. APFC planned to use the *Atlantic Star* to harvest Atlantic mackerel from December to May of each year and to harvest Atlantic herring year-round. Plaintiff expected the *Atlantic Star* to catch approximately 50,000 metric tons of fish per year.

Prior to purchasing the *Atlantic Star*, plaintiff researched the east coast Atlantic mackerel and herring fisheries. Plaintiff's research included consulting various government publications, in particular a study conducted by the United States International Trade Commission ("ITC") entitled "Mackerel: Competitiveness of the U.S. Industry in Domestic and Foreign Markets." The ITC study resulted from a request by the Senate Finance Committee, which was concerned about the lack of development of the United States Atlantic mackerel resource. The ITC concluded, among other things, that the use of larger fishing vessels would offer economies of scale and would improve the competitive position of the United States Atlantic mackerel industry. Plaintiff relied on this study in developing the *Atlantic Star* project.

Plaintiff's considerations took place against the backdrop of the regulatory scheme governing the Atlantic mackerel and herring fisheries. Beyond state waters, out to the 200–mile limit of the EEZ, the federal government manages fishery resources. The federal regulatory scheme was established by the Magnuson Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. §§ 1801–1883 (1994 & Supp. III 1997). [4] The Magnuson Act confers primary

1. The relevant facts of this case are undisputed and are contained in plaintiff's proposed findings of fact and supporting appendices. Defendant stated that it was unable to respond to certain of plaintiff's proposed facts regarding the economic impact of the congressional legislation at issue here. It did not, however, request additional discovery under Rule of the Court of Federal Claims 56(g) because counsel believed that economic discovery had been prohibited. This was based on the following statement by the court at a prior oral argument: "If you say you need discovery or the Government does, and I'm talking about things other than damages, then I would hope you all could reach some agreement." Tr. Dec. 14, 1999, Oral Arg. at 75. This statement did not foreclose all economic discovery; the only discovery perhaps foreclosed by the court's statement was discovery relating solely to damages. The relevance of the economic impact of the legislation in question here is not limited to damages. The economic impact of the legislation is part of the liability inquiry in a regulatory takings case. Defendant could have responded, either substantively or by requesting additional discovery. Without either of these actions, the facts alleged by plaintiff regarding the economic impact of the legislation on its property are deemed established for purposes of determining liability. *See* Rule of the Court of Federal Claims 56(d)(3); *Avia Group Int'l, Inc. v. L.A. Gear Cal.,*

*Inc.*, 853 F.2d 1557, 1561 (Fed.Cir.1988); *Carolina Power & Light v. United States*, 48 Fed.Cl. 35, 41 n. 4 (2000). We note, in any event, that if plaintiff in fact suffered no economic impact, it will not be able to prove damages.

We also note that we do not rely on paragraph 7 of the Supplemental Declaration of Lisa A. Kohlwes Torgersen. That paragraph improperly contains legal argument. It is hereby stricken from the record.

2. APFC's immediate predecessor as owner of the *Atlantic Star* is the Atlantic Star Fishing Company. The owners of the Atlantic Star Fishing Company created APFC to finance the *Atlantic Star* project. For the sake of simplicity, the term "plaintiff" in this opinion shall include both APFC and the Atlantic Star Fishing Company.

3. The *Atlantic Star* was acquired by plaintiff on November 14, 1996. The vessel underwent conversion and outfitting work in 1997, with the work being completed in November of that year. On July 6, 1999, plaintiff sold the *Atlantic Star* to its Dutch lenders.

4. In this opinion, all citations to the United States Code and the Code of Federal Regulations are to those codes as they existed in 1997.

federal management authority over marine fishery resources on the Secretary of Commerce and the National Marine Fisheries Service ("NMFS"), a subunit of the National Oceanic and Atmospheric Administration ("NOAA") within the United States Department of Commerce. Integral in the management of the fisheries within the EEZ are eight regional fishery management councils. These councils are charged with developing fishery management plans in accordance with national standards set forth in 16 U.S.C. § 1851. Once developed and approved by the Secretary of Commerce, a Fishery Management Plan ("FMP") is then promulgated by the NMFS. The relevant councils here are the Mid–Atlantic Fishery Management Council ("MAFMC") and the New England Fishery Management Council ("NEFMC"). The MAFMC has management responsibility for Atlantic mackerel, and an FMP was in place for Atlantic mackerel at the time plaintiff was seeking entry to that fishery. The NEFMC has management responsibility for Atlantic herring. An FMP was not in place for Atlantic herring at the time plaintiff sought entry to that fishery.

For several years prior to plaintiff's development of the *Atlantic Star* project, the NMFS had been making public statements that the herring and mackerel stocks were at high abundance levels and low levels of exploitation. Additionally, several documents published by the MAFMC in the years leading up to the *Atlantic Star* project discussed the need for large fishing vessels in the east coast industry. Each of these documents contained the following passage, relied upon by plaintiff in developing the *Atlantic Star* project:

> The key problem for the U.S. fishery remains that of Atlantic mackerel not being a desirable fish in the eyes of most American consumers, and transportation costs have

been prohibitive in shipping this low-value, bulk product to foreign markets where it enjoys greater acceptance. In order to compete in the world bulk market, the U.S. industry will have to emulate its foreign competitors, which harvest, process and ship mackerel in large quantities to take advantage of economies of scale.

> . . . .

> Currently the U.S. east coast industry does not have the large vessels necessary to participate in this market . . . .

In addition, in 1994 the NMFS had rescinded an earlier control date for the Atlantic mackerel fishery. The control date of August 13, 1992, had been intended to "preclude speculative entry into the mackerel fishery" by placing future entrants to the fishery on notice that they would not be guaranteed future access to the Atlantic mackerel fishery should a management regime be implemented. 57 Fed.Reg. 36,384 (Aug. 13, 1992). This control date was rescinded on September 27, 1994, because the MAFMC no longer believed "that the Atlantic mackerel fishery will require the imposition of some type of limited-entry management system." 59 Fed.Reg. 49,235 (Sept. 27, 1994).[5]

For the years the *Atlantic Star* would have participated in the Atlantic mackerel and herring fisheries, the MAFMC proposed, and the NMFS approved, an Allowable Biological Catch ("ABC") for the Atlantic mackerel fishery. For Atlantic mackerel, the ABC for 1997 was 1,178,000 metric tons; the ABC for 1998 was 382,000 metric tons; and the ABC for 1999 was 383,000 metric tons. These limits were based on the best scientific information available to the NMFS. The United States commercial landings of Atlantic mackerel in the years listed were as follows: 15,706 metric tons in 1997, 12,513 met-

---

**5.** Plaintiff alleges that it relied on the rescission of the control date for Atlantic mackerel when making its decision to invest in the *Atlantic Star*. Pl.'s Proposed Findings ¶ 54. However, this proposed finding cites only to a paragraph of the complaint, ¶ 30, that was denied by defendant. Furthermore, there is no documentary evidence supporting this finding. Pursuant to Rule of the Court of Federal Claims 56(d)(3), this court can-

not deem a fact established that is not "adequately supported." This support cannot come from a party's own pleading. Rule of the Court of Federal Claims 56(d)(1) ("Each paragraph [of the Proposed Findings of Uncontroverted Fact] shall contain citations to the opposing party's pleadings or to documentary evidence, such as affidavits or exhibits, filed with the motion or otherwise part of the record in the case.").

ric tons in 1998, and 12,050 metric tons in 1999.

In its draft FMP for the Atlantic herring fishery,[6] the NEFMC has proposed an ABC of 300,000 metric tons. The United States commercial landings of Atlantic herring for the past several years were as follows: 89,-415 metric tons in 1996, 95,715 metric tons in 1997, and 81,512 metric tons in 1998.

Plaintiff relied on these figures in making its decisions regarding the *Atlantic Star* project. As a result of its research, plaintiff concluded that an investment in the Atlantic mackerel and herring fisheries would be reasonable, low risk, and profitable. Consequently, plaintiff purchased the *Atlantic Star* and set about converting the vessel in Norway for use in the Atlantic mackerel and herring fisheries of the EEZ.

Plaintiff also applied for the necessary fishery permits and gear authorizations. Under 50 C.F.R. § 648.4(a)(5), a fishing vessel must have and carry on board a valid Atlantic mackerel permit in order to fish for, possess, or land Atlantic mackerel in or from the EEZ. Under 50 C.F.R. § 648.4(e)(1), the Regional Administrator for NMFS must issue the permit within 30 days of receipt of the application. Additionally, because of the possibility that Northeast Multispecies (Nonregulated) fish might be caught as incidental by-catch, plaintiff applied for a Northeast Multispecies (Nonregulated) permit. Finally, vessels harvesting Atlantic mackerel and herring in the Gulf of Maine/Georges Bank Regulated Mesh Area with midwater trawl gear of mesh size less than that normally required by the regulations were required to carry on board an authorization letter issued by the Regional Administrator pursuant to 50 C.F.R. § 648.80(d).

The fishing permits were initially issued by the Northeast Regional Office of NMFS to the vessel as owned by the Atlantic Star Fishing Company on February 5, 1997, and were re-issued to the vessel as owned by APFC on April 8, 1997, and April 12, 1997, after ownership of the vessel had passed to APFC. The permit number remained the same after transfer, and the permits granted were the following:

1. Federal Fisheries Permit # 610018, for Atlantic mackerel and *Illex* squid and for incidental *Loligo* squid and butterfish, with an expiration date of December 31, 1997; and

2. Federal Fisheries Permit # 610018, for Northeast Multispecies (Nonregulated), with an expiration date of April 30, 1998.

On August 28, 1997, the regional office of NMFS also issued to the *Atlantic Star* a Gulf of Maine/Georges Bank Midwater Trawl Gear Authorization letter for Atlantic herring, blueback herring, mackerel, and squid. The letter had an expiration date of April 30, 1998.

As news of the *Atlantic Star* project spread, local commercial opposition to the vessel's entry into the Atlantic mackerel and herring fisheries began to form. At a joint meeting of the Atlantic Herring Section and the NEFMC Herring Committee in March 1997, potential restrictions on vessel specifications were discussed. The concern about the *Atlantic Star* was obvious. One attendee at the joint meeting stated, "There's a U.S. boat in Norway that will have a 300 ton daily capacity. There's room for growth in the herring and mackerel fishery but not this much growth and not at this pace without severely impacting the current herring and mackerel fishery. We need to keep this fishery local." A motion was made to discuss, at the next meeting, placing a limit of 150–160 feet and 2500 horsepower on fishing vessels. To this motion, one of the meeting's participants responded that a limit of 170 feet and 3000 horsepower would be a "good limit" because he was refitting a 165 foot boat for participation in the fishery.

The concerns expressed at the March 1997 Joint Meeting were echoed in H.R. 1855, introduced in the United States House of Representatives on June 10, 1997. This bill proposed to establish a moratorium on large fishing vessels in the Atlantic mackerel and herring fisheries. A large fishing vessel was defined as "a fishing vessel . . . of the United

---

6. This draft FMP was partially approved by the Secretary of Commerce on October 27, 1999.

States that is equal to or greater than 165 feet in length overall and has an engine of more than 3,000 horsepower." Hearings on the bill were held on June 26, 1997, before the House Subcommittee on Fisheries Conservation, Wildlife and Oceans. The *Atlantic Star* project was specifically discussed at these hearings. *See Fish and Wild Life Issues: Hearing on H.R. 1855 Before the House Subcomm. on Fisheries Conservation, Wildlife and Oceans,* 105th Cong. (1997). Michael Love, general manager of the *Atlantic Star,* testified against the bill and stated that, to the best of his knowledge, plaintiff owned the only vessel "that would be kept out by the bill in its present form." *See id.* at 1997 WL 11234446. The bill passed the House on July 28, 1997.

In September 1997, the NMFS announced a new control date for the Atlantic mackerel fishery. The control date was issued to provide notice to anyone "entering the commercial Atlantic mackerel fishery after September 12, 1997," that they would "not be assured of future access to the Atlantic mackerel resource in Federal waters if a management regime is developed and implemented" under the Magnuson Act. 62 Fed. Reg. 48047 (Sept. 12, 1997). "The potential eligibility criteria [in the future might] be based on historical participation [in the fishery], defined as any number of trips having any documented amount of Atlantic mackerel landings." *Id.* The rationale given for the new control date was as follows:

> Discussion of reinstatement of a control date was prompted by news that a large factory trawler[7] was undergoing conversion to enter this fishery. Council members noted that, although the fishery is currently underexploited, a substantial increase in exploitation could be effected in a short period of time by the introduction of a factory trawler fleet. To prevent overcapitalization, Council members expressed the need to implement a management program for this fishery that allowed for controlled expansion.... The Council members noted that [the existing capital in the

fishery], along with the possible addition of factory trawlers, raised concerns because the current estimate of long-term potential yield for this fishery is 150,000 [metric tons]. Further, both NMFS and the Council have indicated that first preference for entry into this fishery should be afforded to Northeast region vessels as an alternative to traditional fisheries that have been severely overfished.

*Id.*[8]

Also in September 1997, a bill paralleling H.R. 1855 was introduced in the United States Senate. That bill, S. 1192, provided for the revocation of Atlantic mackerel or herring permits that had been issued to vessels "165 feet in length or longer" or possessing "an engine or engines capable of producing a total of more than 3,000 horsepower." In introducing the bill, Senator Olympia Snowe, although not naming the *Atlantic Star,* undoubtedly spoke of the vessel when referring to the "369 foot factory trawler" entering the Atlantic mackerel and herring fisheries as a "dramatic new proposal ... which could alter the planned course of sustainable development for these fisheries." 143 Cong. Rec. S9637–01, S9644 (Sept. 18, 1997).

Neither H.R. 1855 nor S. 1192 was enacted into law. In fact, the NMFS and NOAA questioned the wisdom of legislatively revoking plaintiff's permits; the general position of the NMFS was that the regional fishery management councils were the appropriate entities to consider limits on fisheries permits.

Nevertheless, Congress achieved the purpose of H.R. 1855 and S. 1192 through a rider attached to the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub.L. 105–119, which was enacted on November 26, 1997 ("1997 Appropriations Act"). Section 616 of the 1997 Appropriations Act provided as follows:

---

**7.** To be precise, the *Atlantic Star* was not a factory trawler; it was a freezer trawler. A freezer trawler only freezes the fish it catches; it does not otherwise process them.

**8.** At the time this lawsuit was filed, no rule had been adopted limiting access to the fishery.

(a) None of the funds made available in this Act may be used to issue or renew a fishing permit or authorization for any fishing vessel of the United States greater than 165 feet in registered length or of more than 750 gross registered tons, and that has an engine or engines capable of producing a total of more than 3,000 shaft horsepower—

(1) as specified in the permit application required under part 648.4(a)(5) of title 50, Code of Federal Regulations, and the authorization required under part 648.80(d)(2) of title 50, Code of Federal Regulations, to engage in fishing for Atlantic mackerel or herring (or both) under the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.); or

(2) that would allow such a vessel to engage in the catching, taking, or harvesting of fish in any other fishery within the exclusive economic zone of the United States (except territories), unless a certificate of documentation has been issued for the vessel and endorsed with a fishery endorsement that was effective on September 25, 1997 and such fishery endorsement was not surrendered at any time thereafter.

(b) Any fishing permit or authorization issued or renewed prior to the date of the enactment of this Act for a fishing vessel to which the prohibition in subsection (a)(1) applies that would allow such vessel to engage in fishing for Atlantic mackerel or herring (or both) during fiscal year 1998 shall be null and void, and none of the funds made available in this Act may be used to issue a fishing permit or authorization that would allow a vessel whose permit or authorization was made null and void pursuant to this subsection to engage in the catching, taking, or harvesting of fish in any other fishery within the exclusive economic zone of the United States.

The rider, in short, retroactively cancelled plaintiff's existing permits and authorization letter and prospectively precluded re-issuance of such permits. It is undisputed that the only immediate impact of the rider was to invalidate the *Atlantic Star*'s current fishing permits. No other vessels were affected by the legislative revocation.

An identical provision, applicable to the following fiscal year, was enacted on October 21, 1998, as § 617 of the Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1999, Pub.L. 105–277 ("1998 Appropriations Act"). Finally, on May 21, 1999, Congress enacted § 3025 of the 1999 Emergency Supplemental Appropriations Act, Pub.L. 106–31, ("1999 Appropriations Act") which amended § 617 of the 1998 Appropriations Act and made the vessel-size limitation and permit revocation permanent: [9]

Section 617 of [the 1998 Appropriations Act] is amended—

(1) by striking subsection (a) and inserting the following:

"(a) None of the funds made available in this Act or any other Act hereafter enacted may be used to issue or renew a fishing permit or authorization for any fishing vessel of the United States greater than 165 feet in registered length, of more than 750 gross registered tons, or that has an engine or engines capable of producing a total of more than 3,000 shaft horsepower as specified in the permit application required under part 648.4(a)(5) of title 50, Code of Federal Regulations, part 648.12 of title 50, Code of Federal Regulations, and the authorization required under part 648.80(d)(2) of title 50, Code of Federal Regulations, to engage in fishing for Atlantic mackerel or herring (or both) under the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), unless the regional fish-

---

9. In the time since this lawsuit was filed, the MAFMC and NEFMC have recommended, and the NMFS has promulgated, regulations reflecting the statutory prohibition. *See* 64 Fed.Reg. 57587–01 (Oct. 26, 1999) (imposing vessel-size limitations on vessels engaged in the Atlantic mackerel fishery); 65 Fed.Reg. 77450 (Dec. 11, 2000) (imposing vessel-size limitations on vessels engaged in the Atlantic herring fishery).

ery management council of jurisdiction recommends after October 21, 1998, and the Secretary of Commerce approves, conservation and management measures in accordance with such Act to allow such vessel to engage in fishing for Atlantic mackerel or herring (or both)."; and

(2) in subsection (b), by striking "subsection (a)(1)" and inserting "subsection (a)".

This legislative approach to the revocation of fishery permits and authorization letters was unique. Never before had the NMFS revoked a fishery permit in response to a Congressional appropriation act. Congress did not consult with United States fishery officials before deciding to nullify the *Atlantic Star*'s permits or ask those officials to recommend or consider alternatives. Congress did not ask the NMFS what its opinion would be regarding the revocation of a fishing permit by act of Congress. The size thresholds established by the legislation were developed by Congress and not by the NMFS. Furthermore, in a deposition taken in this case, the government's own stock assessment scientist for Atlantic mackerel and herring stated that the *Atlantic Star*'s entry into the Atlantic mackerel and herring fisheries would have had no negative impact on either species.

Congress's action also differed from previous legislative programs to reduce fishing capacity. In the past, the government has paid owners when it sought to obtain their permits and remove their vessels from fishing. For example, a fishing capacity reduction program was created by the Sustainable Fisheries Act, Pub.L. 104–297, enacted on October 11, 1996. This legislation authorizes the Secretary of Commerce to pay the owner of a fishing vessel if the vessel is withdrawn from a particular fishery; it also authorizes the Secretary to pay the owner of a fishing permit if the permit is surrendered for permanent revocation. Pursuant to this legislation, the Secretary of Commerce may implement a fishing capacity reduction program if certain statutory criteria are met; these criteria include finding that the program is necessary to "prevent or end overfishing," finding that the program is consistent with the "Federal or State fishery management plan," and finding that the program is "cost-effective." 16 U.S.C. § 1861a(b)(1). This reduction program is voluntary, and its objective is "to obtain the maximum sustained reduction in fishing capacity at the least cost and in a minimum period of time." 16 U.S.C. § 1861a(b)(2). Plaintiff was aware of this prior practice. The legislation revoking the *Atlantic Star*'s permit and authorization letter was not voluntary and did not provide for any compensation to the owners.

The *Atlantic Star* was the only vessel to have its Atlantic mackerel permit and gear authorization letter revoked because of the 1997 Appropriations Act. Because of the revocation of its Atlantic mackerel permit, the *Atlantic Star* could not lawfully participate in the Atlantic mackerel fishery from the beginning of December 1997 until July 1999 when plaintiff sold the *Atlantic Star*. Furthermore, because of the prohibition on issuing any other fishing permits, the *Atlantic Star*, during this period, could not participate in any other United States fisheries in the EEZ for which permits were required. But for the revocation of its permit and authorization letter by these enactments, the *Atlantic Star* would have fished for Atlantic mackerel and herring in 1997, 1998, and 1999. No regulations of general application were promulgated in 1997 or 1998 that would have prevented the *Atlantic Star* from fishing for Atlantic mackerel if its fisheries permit had not been rendered null and void by Congress.

With the *Atlantic Star* unable to participate in the fisheries for which it was intended or in any other fisheries in the EEZ requiring a permit, the economic value of the vessel was dramatically reduced. Although, even after the enactment of the 1997 Appropriations Rider, the *Atlantic Star* could have fished solely for Atlantic herring in non-closed waters with midwater trawl gear, it would not have earned a profit doing so. The profitability of the *Atlantic Star* depended upon its ability to fish for Atlantic mackerel, with or without the gear authorization

letter.[10] There are no fisheries in existence in waters of the United States not requiring a fishery permit in which the *Atlantic Star* could have participated on a profitable basis.[11] Furthermore, there are no commercially-marketable fish beyond the 200 mile limit of the EEZ that can be economically harvested by a pelagic mid-water trawler such as the *Atlantic Star*. The *Atlantic Star* had the capability to fish in foreign waters but not on an economically viable basis. The *Atlantic Star* was a United States flagged vessel and, as such, could not participate in foreign fisheries without purchasing fishing rights. These foreign fishing rights are typically very expensive. Furthermore, reflagging the vessel in a foreign country would have permanently barred the *Atlantic Star* from ever participating in American fisheries as a United States flagged vessel.

Plaintiff could not convert the *Atlantic Star* to any non-fishing use because of the specialized fishing and freezing equipment on board the vessel. Conversion would have required the removal of this equipment, and this removal only could have been accomplished at a high cost. Additionally, removal of this freezing equipment would have destroyed the value of the vessel and the investment plaintiff made in it. Plaintiff would no longer have had a fishing vessel, and nothing would have been left of the investment in the vessel for the purpose of fishing.

In response to the revocation of its permit and authorization letter, plaintiff filed a lawsuit in the U.S. District Court for the District of Columbia, challenging the constitutionality of the government's action and seeking a preliminary injunction against enforcement of the appropriations provisions. The district court denied the request for a preliminary injunction. On March 9, 1999, plaintiff filed this lawsuit alleging an uncompensated taking. On July 9, 1999, plaintiff sold the vessel to its Dutch lenders. On November 29, 1999, the district court action was dismissed as moot because plaintiff no longer owned the *Atlantic Star*. This court must now determine whether the Fifth Amendment's Takings Clause provides a basis for granting plaintiff relief.

## DISCUSSION

The Fifth Amendment to the United States Constitution prohibits the federal government from taking private property without just compensation. This is not an abstract guarantee. It is an immensely practical device to protect the rights of the individual when faced with collective action. In this connection, the present facts are deeply disturbing. It is undisputed that plaintiff's owners undertook, virtually at government invitation, to invest substantial resources in the vessel. They did everything required of them at the time to comply with the existing regulatory regime to ensure that the *Atlantic Star* could be used for commercial fishing. Congress put those regulations in place and entrusted to the NMFS their enforcement, including the ground rules for possible revocation. Although the court has misgivings about the rationale for what Congress then did, it will be assumed that Congress had good and sufficient reasons for revoking only the *Atlantic Star*'s permits, and thereby making the regulatory scheme uniquely unavailable to the vessel. The impact was the same. The investment, reasonably undertaken under the circumstances, was compromised in an instant. What makes the facts particularly troublesome is that, under existing precedent, it is far from clear that the Takings Clause is implicated. If that is the case, however, the result would undermine fundamental assumptions as to the government's rights vis à vis private property.

10. For this reason, the use the court shall consider in its analysis is the use of the *Atlantic Star* to fish for mackerel.

11. Defendant did not agree with this proposed finding and stated, "There were other fisheries within the EEZ of the United States which the *Atlantic Star* could have fished without a permit or gear authorization." Def.'s Stmt. Genuine Issues ¶ 152. This statement is non-responsive to plaintiff's proposed finding. Plaintiff did not allege that there were no fisheries available to it at all; rather, it alleged that there were no fisheries available to it in which it could make a profit. Plaintiff supported this statement with the Declaration of Lisa A. Kohlwes Torgersen. Consequently, defendant has failed to identify a genuine dispute regarding this fact.

As nothing was physically taken or destroyed, plaintiff asserts a regulatory taking of personal property. The beginning of the application of the Takings Clause to other than physical takings is often traced to Holmes's observation that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). He pointed out that "[w]hen this seemingly absolute protection [the Takings Clause] is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears." *Id.* From this, the Court has held that land use regulation will constitute a taking if it "denies an owner economically viable use of his land." *Agins v. Tiburon,*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

This regulatory takings analysis has frequently been tested in the context of the regulation of real estate. *See, e.g., Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The rule is relatively clear. If the regulation destroys *all* economically viable use of the land, i.e., if the owner has been "called upon ... to leave his property economically idle," there is a compensable taking *per se. Lucas,* 505 U.S. at 1019, 112 S.Ct. 2886. If the destruction of use is less than complete, the court engages in an "essentially ad hoc, factual inquiry" that includes analysis of three factors: the extent to which the governmental action interferes with distinct, investment-backed expectations; the character of the governmental action; and the extent of economic impact on the claimant. *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646. As the Court explained in *Penn Central,* the focus in less-than-total destruction of use claims is "on the uses the regulations permit." *Id.* at 131, 98 S.Ct. 2646.

The *Penn Central* analysis for identifying a regulatory taking also has been applied in the context of personalty. In *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Court used the three-part analysis when considering a prohibition on the sale of Indian artifacts containing eagle feathers. It held that "the denial of one traditional property right does not always amount to a taking. At least where the owner possess a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking because the aggregate must be viewed in its entirety." *Id.* at 65–66, 100 S.Ct. 318. In the circumstances, it found that the prohibition on use was not complete, nor was "it clear that appellees [would] be unable to derive economic benefit from the artifacts." *Id.* at 66, 100 S.Ct. 318.

In *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), the Court launched the *Penn Central* three-part regulatory takings analysis into new waters: intangible personalty. That case involved the legislative creation of an obligation to private third parties, in a way arguably inconsistent with prior contract rights and obligations. The court rejected the takings claim, concluding that the Fifth Amendment is not implicated merely because Congress chooses to require one person to benefit another. The government had not occupied or destroyed the employer's property, the penalty for withdrawal was not out of proportion to the company's experience with the plan, and pension plans had long been subject to regulation. *Id.* at 226–27, 106 S.Ct. 1018.

A more recent claim of regulatory taking involving intangible personalty is *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). A plurality of the Court applied the Takings Clause to strike down (rather than require compensation for) legislation that, in the majority's view,[12] created a liability from one private entity to another based on past actions. In short, the legislation was retroactive in effect. It created financial obligations in com-

---

**12.** Justice Kennedy created a majority in remedy by agreeing that the retroactive nature of the liability was problematic, though because of the

Due Process Clause rather than the Takings Clause.

panies presently or previously engaged in coal mining to present or former employees or their families.

The plurality begins its analysis with a recognition that the Takings Clause has potential application to economic regulation affecting personalty. *Eastern Enterprises,* 524 U.S. at 523, 118 S.Ct. 2131. It then calls attention to the relevance of the "justice and fairness" of the governmental action in determining whether a taking has occurred. *Id.* (citing *Andrus,* 444 U.S. at 65, 100 S.Ct. 318). In implementing that inherently factual and ad hoc inquiry, the plurality uses the three *Penn Central* factors. *Id.*

Positing the power of Congress to "adjust the burdens and benefits of economic life;" *id.* at 524, 118 S.Ct. 2131 (citing *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (a challenge based on due process)), the plurality nevertheless concluded that "[o]ur decisions have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of persons that could not have anticipated the liability, and the extent of the liability is substantially disproportionate to the parties' experience." *Id.* at 528–29. In applying these factors, the plurality used the familiar *Penn Central* template to conclude that the medical benefits legislation at issue constituted a taking: the economic impact, while not confiscatory, was "substantial;" the plaintiff had good reason not to anticipate the imposition, thus it had a reasonable, investment-backed expectation that the retroactive legislation would not have been adopted; and finally, the targeted nature of the legislation made the character of the government action appear to be a taking.

Justice Kennedy disagreed with the takings analysis because he could find no clearly identified, traditional, property interest. *Id.* at 544, 118 S.Ct. 2131 (Kennedy, J., concurring in the judgment and dissenting in part). He believed the legislation to be constitutionally defective, however, on due process grounds, because the remedy imposed by the legislation bore no legitimate relationship to the interests asserted by the government in its support. He, too, was troubled by the retroactive, targeted nature of the legislation. *Id.* at 549.

From these decisions, we deduce that the Takings Clause has applicability to both tangible and intangible personalty. The relevant test for a regulatory taking in such circumstances is the now-traditional *Penn Central* three part analysis. Despite the plurality in *Eastern Enterprises,* however, what has not changed is the need to identify the "property" allegedly taken for public use, because the Takings Clause only protects juridically recognized property interests. *See M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995). In this case, from the standpoint of traditional property concepts, the res potentially taken by the government was the ship itself. Licenses or permits are traditionally treated as not protected by the Takings Clause because they are created by the government and can be cancelled by the government and normally are not transferrable.

The *Atlantic Star, qua* ship, plainly constitutes property for Fifth Amendment purposes, as the government concedes. Here, however, the owner was left with the ship; it was not physically taken. Instead, restrictions merely were placed on its use. That is not fatal to a takings claim, however. As evident from *Lucas,* the Fifth Amendment contemplates that compensation is owed when government, by regulation, so completely destroys the beneficial uses of property that it is, in effect, idled. This focus on the vessel thus distinguishes the facts from cases dealing with claims that the permits at issue were property in themselves. *See Bradshaw v. United States,* 47 Fed.Cl. 549, 553 (2000) ("A grazing permit . . . was never intended to become a property right."); *Hage v. United States,* 35 Fed.Cl. 147, 171 (1996) ("reliance on the privilege to graze . . . [cannot] create a property interest."). The question in this case thus becomes: are the uses prohibited within the bundle of rights otherwise inherent in the vessel?

As this court noted in a takings case involving the use of vessels to carry oil and hazardous substances: "The inquiry is not so

simple as examining whether the Government prevents the exercise of a property right by regulating it, transforming the property right into one 'totally dependent' on the Government's regulatory regime. That is a tautology; the inquiry is considerably more nuanced." *Maritrans, Inc. v. United States,* 40 Fed.Cl. 790, 796 (1998). To determine whether a property right exists independent of the regulatory scheme, it is necessary to decide "whether an independent or preexisting right of use under common law applies." *Id.* at 798; *see also Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 217 (Fed.Cir.1993).

The relevant stick in the bundle in this context is the right to use the *Atlantic Star* to fish, subject to regulation. The government argues that the use of the vessel to fish in the EEZ was entirely dependent upon the government's regulatory scheme. We can assume for argument's sake that the government's assertion is correct without terminating the analysis. To say that the plaintiff's rights to fish were subject to a pervasive regulatory scheme—plainly they were—is not to say that nothing the government did with respect to those rights could ever implicate the Takings Clause.

We are not confronted here with a property or a use which is inherently dangerous or a nuisance. There is nothing in the nature of a fishing vessel that suggests that any use is totally a matter of governmental grace. This distinguishes the facts at the outset from cases cited such as *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), and *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928). Absent such a built-in limitation, personal property, like land, comes with an inherent right of use. We note that the right to use is one of the "group of rights inhering in the citizen's relation to [a] physical thing." *United States v. Gen. Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945); *see also Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* 135 F.3d 275, 286 (4th Cir.1998) (identifying the right of use as one of the "classical property rights").

As this court has held, "Inherent in the ownership of vessels is the right to use them." *Maritrans,* 40 Fed.Cl. at 799.

The nature of the use involved—fishing— also distinguishes this case from two other decisions relied on heavily by defendant. The Federal Circuit in *Allied–General Nuclear Services v. United States,* 839 F.2d 1572 (Fed.Cir.1988), found no taking where the government, in light of a Presidential ban on the recycling of spent plutonium, refused to issue an operating license to a plant designed for that purpose. The ban was issued in the interest of national security, and the court held that the Fifth Amendment provided no protection to one "who proposed use of property injurious to common defense." *Allied–General,* 839 F.2d at 1576.

*Mitchell Arms, Inc. v. United States,* 26 Cl.Ct. 1 (1992), *aff'd* 7 F.3d 212 (Fed.Cir. 1993), concerned the suspension of import licenses for semiautomatic, assault-type rifles. The suspension of these licenses resulted in the plaintiff's loss of "the opportunity to sell the assault rifles in their original configuration." *Mitchell Arms,* 26 Cl.Ct. at 4. The plaintiff alleged that loss of this opportunity amounted to a taking without just compensation. This court rejected the argument, finding that the "right to sell assault weapons in domestic commerce [ ] is not a right inherent in plaintiff's ownership of those weapons." *Id.* at 6.[13]

Fishing, however, can hardly be equated to "the novelty of nuclear fission" and "the fearsome effect of its use in war," *Allied–General,* 839 F.2d at 1577, or to the importation of assault rifles. Fishing and fission only sound alike. The use claimed—fishing—is not as transparently a matter of official grace. For that reason, the present facts are more akin to decisions dealing with what expectations can accrue in a "highly regulated" but otherwise innocuous business.

This is not inconsistent with the recent decision of this court in *Conti v. United States,* 48 Fed.Cl. 532 (2001). The plaintiff in

---

**13.** *Mitchell Arms* distinguished *United Nuclear Corp. v. United States,* 912 F.2d 1432 (Fed.Cir. 1990), in which the court had found a taking of a right to mine uranium. The *Mitchell Arms* court

recognized that the right to mine was "inherent in the ownership rights that United Nuclear ... held independent of their denied permits." *Mitchell Arms,* 26 Cl.Ct. at 6.

*Conti* alleged that an NMFS regulation prohibiting the use of drift gillnets in the Atlantic swordfish fishery had taken his property interest in the use of those gillnets without compensation. In the opinion in *Conti*, Judge Margolis concluded that a participant in the Atlantic swordfish fishery did not possess a property interest in the continued use of gillnets in that fishery; therefore, no taking had occurred.

*Conti* is distinguishable. There was no revocation of any of Conti's existing permits by any government body, nor was there any denial of future permits. The decision to implement the gillnet moratorium was made by the NMFS, not Congress. The restriction was limited to a particular use of plaintiff's boat, not, as here, effectively all uses. Importantly, there was no allegation that the plaintiff was being singled out. The court's analysis, moreover, focused on the permit itself as the relevant property interest. The court stated, "[P]laintiff's reliance on his permit cannot confer a property interest upon him," and agreed with the government's assertion that "fishery permits do not create property interests." *Conti*, 48 Fed.Cl. at 538; *see also* 16 U.S.C. § 1853(d)(3)(D). The question the court addresses here is framed differently: whether the legislation took all economically beneficial use of the ship.[14]

■ Defendant also points the court to *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). In *Bowen*, the Court considered whether the State of California, based on an agreement with the federal government pursuant to a federal statute, possessed a protected property right to withdraw from the Social Security scheme. The Court rejected California's argument and held that the " 'contractual right' at issue in this case bears little, if any resemblance to rights held to constitute 'property' within the meaning of the Fifth Amendment." *Bowen*, 477 U.S. at 55, 106 S.Ct. 2390. This finding was based on the fact that "the termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in

[the statute] itself." *Id.* The subsequent legislation, in short, took away what prior legislation had created. The facts here are plainly different, for reasons already cited. Fishing as a livelihood is not a creation of the government. We conclude that plaintiff possessed a property interest in using its vessel to fish, albeit subject to the regulatory regime. We must now decide whether the particular facts of this case constitute a taking in the context of the three-part *Penn Central* test.

### 1. Interference with Distinct, Investment–Backed Expectations

In the years leading up to the time plaintiff purchased the *Atlantic Star* and began investing money in its conversion to a pelagic trawler, the NMFS and the ITC expressly stated that there was a need for larger fishing vessels in the Atlantic mackerel fishery. In 1994, the NMFS had rescinded a control date for Atlantic mackerel because the MAFMC no longer believed "that the Atlantic mackerel fishery [would] require the imposition of some type of limited-entry management system." 59 Fed.Reg. 49,235 (Sept. 27, 1994). Furthermore, the ABC for Atlantic mackerel in 1997, 1998, and 1999 far exceeded the U.S. commercial landings of Atlantic mackerel in those years. For example, in 1997, the ABC for Atlantic mackerel was 1,178,000 metric tons, but the U.S. commercial landings amounted to only 15,706 metric tons. Plaintiff planned to catch 50,-000 metric tons of Atlantic mackerel *and* herring per year. Thus, plaintiff reasonably believed there was ample room in the Atlantic mackerel fishery for the *Atlantic Star.*

Pursuant to the regulatory scheme, a permit had already been issued to the *Atlantic Star* at the time the 1997 Appropriations Act was enacted. The plaintiff was therefore legally entitled to use the *Atlantic Star* to fish for Atlantic mackerel in the EEZ. Under the regulations, this entitlement could only be revoked for cause. The regulations created certain expectations in both applicants and permit holders. The NMFS, for instance, did not have discretion regarding

---

14. We note also that the court in *Conti* did not     address the revocation of existing permits.

the issuance and renewal of Atlantic mackerel permits. The NMFS must "issue a permit within 30 days of receipt of the application, unless the application is deemed incomplete" for one of five reasons:

(i) The applicant has failed to submit a complete application. . . . ;

(ii) The application was not received by the Regional Administrator by the applicable deadline set forth in this section;

(iii) The applicant and applicant's vessel failed to meet all applicable eligibility requirements set forth in this section;

(iv) The applicant applying for a limited access multispecies combination vessel or individual DAS permit, a full-time or part-time limited access scallop permit, or electing to use a VTS, has failed to meet all of the VTS requirements . . . . ; or

(v) The applicant has failed to meet any other application requirements stated in this part.

50 C.F.R. § 648.4(e)(1). Moreover, as long as a fishing vessel to which a mackerel permit has been issued is in compliance with the laws and regulations administered by the NMFS, the NMFS is required to issue a renewal permit to that vessel within 30 days of receipt of the owner's renewal application. It is also uncontroverted that, but for the revocation of its permit by Congress, the *Atlantic Star* would have fished for Atlantic mackerel in 1997, 1998, and 1999. No regulations were promulgated in 1997 or 1998 that would have prevented the *Atlantic Star* from obtaining a permit to fish for Atlantic mackerel. Furthermore, plaintiff was aware that, in the past, buyback programs such as that created by Sustainable Fisheries Act, Pub.L. 104–297, had been established when the government desired to reduce fishing capacity.

Plaintiff's expectation of being able to use its vessel to fish for Atlantic mackerel was thus reasonable. Indeed, the government, through the NMFS and the ITC, induced plaintiff to make its investment in the *Atlantic Star*. The government cannot now argue that reliance by plaintiff on the government's own statements was unreasonable. Plaintiff could not assume that the regulatory regime would remain static, but it had no reason to anticipate that Congress would render the regulatory regime *uniquely* unavailable to it. Plaintiff could not have anticipated that Congress would single it out to revoke its permits by legislation.

In a regulated industry, government, through the implementation of a regulatory scheme, helps set the parameters for the reasonable expectations of investors. *See Good v. United States*, 189 F.3d 1355, 1361 (Fed.Cir.1999) (considering the "regulatory climate that existed when Appellant acquired the subject property" in discussing reasonable expectations); *Branch v. United States*, 69 F.3d 1571, 1582 (Fed.Cir.1995) (considering the "historical practices in the bank regulatory field" in discussing reasonable expectations); *Atlas Corp. v. United States*, 895 F.2d 745, 758 (Fed.Cir.1990) (citing *Connolly*, 475 U.S. at 227, 106 S.Ct. 1018 (quoting *FHA v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958))) (emphasis added) (" ' "Those who do business in the regulated field cannot object if the legislative scheme is *buttressed* by subsequent amendments to achieve the legislative end." ' "); *Am. Cont'l Corp. v. United States*, 22 Cl.Ct. 692, 697 (1991) (emphasis added) ("[E]xpectations must be based not only on then-existing federal regulations but also on the recognition that there may well be *related* changes in the regulations in the future."). And Congress, of course, retains the authority to change or even abolish that scheme. The mere fact of regulation, however, does not signify that an investor can never form a reasonable expectation of a return on his investment.

Moreover, having established a particular regulatory scheme, there are limits imposed by the Fifth Amendment to the actions Congress can take in regard to that regulatory scheme without compensating investors who have reasonably relied on the scheme. Plaintiff, when considering entry to the fisheries, could have reasonably anticipated a certain range of future governmental regulation, duly promulgated through the regulatory scheme Congress established. Plaintiff perhaps also could have reasonably foreseen legislation that would limit, in a way applicable to others similarly situated, the issuance of future permits. The targeted revocation

of existing permits, however, and the targeted denial of future permits by Congress were not events any citizen in a constitutional republic could have reasonably expected.[15] In short, at the time plaintiff made its investment in the *Atlantic Star*, its expectation of participating in the Atlantic mackerel fishery was reasonable.

### 2. Degree of Economic Impact [16]

The economic impact on plaintiff of the appropriations riders was severe. Plaintiff spent nearly $40 million on the *Atlantic Star* specifically to equip it to participate in the Atlantic mackerel and herring fisheries. With the enactment of the riders, this investment was wiped out. The *Atlantic Star* could not profitably operate without the permits that were revoked and denied by Congress; the appropriations riders prohibited all profitable uses of the vessel.

The fact that all profitable uses of the *Atlantic Star* were prohibited distinguishes this case from *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210. In that case, the U.S. Supreme Court determined that a prohibition on the sale of Indian artifacts containing eagle feathers did not effect a taking. As previously noted, this finding rested in part on the fact that "it [was] not clear that appellees [would] be unable to derive economic benefit from the artifacts."

*Andrus,* 444 U.S. at 66, 100 S.Ct. 318. Here, the facts demonstrate the opposite conclusion: plaintiff was unable to derive any profitable economic benefit from the *Atlantic Star* after enactment of the appropriations riders. Although the vessel may have retained some scrap value, the government has not argued the possibility. In any event, the diminution in the vessel's value would have been virtually total. After the enactment of the appropriations riders, the *Atlantic Star* had no *commercially viable* uses.[17]

### 3. Character of the Governmental Action

■ The factor of "the character of the governmental action" has been cast in terms of whether the government physically appropriates the res or comes close to doing so. *See Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646.[18] The plurality opinion in *Eastern Enterprises*, however, suggests that, in considering the character of a governmental action alleged to constitute a taking, at least two other factors are also relevant: (1) whether the action is retroactive in effect, and if so, the degree of retroactivity; and (2) whether the action is targeted at a particular individual. *Eastern Enterprises,* 524 U.S. at 532–37, 118 S.Ct. 2131.[19] Both factors are present here.

■ The appropriations riders not only denied future permits but also voided the

---

**15.** The retroactivity and targeted nature of the legislation shall be addressed in the discussion of the character of the governmental action.

**16.** As previously noted, defendant did not respond to plaintiff's proposed findings of fact regarding the economic impact of the legislation. For the reasons already discussed, we therefore deem established the facts alleged by plaintiff and supported by the evidence contained in the appendices accompanying plaintiff's motion.

**17.** This severe economic impact also distinguishes the instant case from *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). In *Goldblatt,* the Court upheld an ordinance regulating dredging and pit excavating as a valid exercise of the police power not requiring the payment of compensation. This holding rested on the fact that there had been no evidence presented "which even remotely suggest[ed] that prohibition of further mining [would] reduce the value of the lot in question." *Goldblatt,* 369 U.S. at 594, 82 S.Ct. 987. Here, the evidence to the contrary is uncontested.

**18.** In *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.1994), the court found that *Lucas* had changed this criterion, "from one in which courts ... were called upon to make ad hoc balancing decisions, balancing private property rights against state regulatory policy, to one in which state property law, incorporating common law nuisance doctrine, controls." *Loveladies Harbor,* 28 F.3d at 1179.

**19.** The plurality's discussion of retroactivity seems to bridge its analysis of reasonable, investment-backed expectations and its analysis of the character of the governmental action. Because the question of whether plaintiff could have reasonably expected retroactive legislation and the question of whether retroactive legislation is of such a character as to support the finding of a taking appear to us to be two sides of the same coin, we discuss both retroactivity and targeting in our analysis of the character of the governmental action.

ones that had already been issued to the *Atlantic Star*. This revocation retroactively made the regulatory scheme established by the Magnuson Act unavailable to plaintiff. Plaintiff had complied with the scheme, but that compliance was retroactively rendered ineffective by Congress.

The disproportionate impact of the legislation is as severe as that at issue in *Eastern Enterprises*. In *Eastern Enterprises*, the plurality stressed the plaintiff's lack of responsibility for the "problem in the funding of retired coal miners' health benefits." *Eastern Enterprises*, 524 U.S. at 537, 118 S.Ct. 2131. Here, there is no serious evidence that a problem in the Atlantic mackerel fishery even existed, and there is no evidence that plaintiff was uniquely responsible for any alleged problem. Without this evidence of responsibility, retroactively making the regulatory scheme unavailable to plaintiff has no support. This retroactivity favors finding a taking.

The circumstances here are different from those in *United States v. Locke*, 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985), where legislation was adopted revoking mining rights that were not perfected within a certain period of time: "As long as proper notice of these rules exists, and the burdens they impose are not so wholly disproportionate to the burdens other individuals face in a highly regulated society that some people are being forced 'alone to bear public burdens which, in all fairness and justice, must be borne by the public as a whole,' the burden imposed is a reasonable restriction on the property right." 471 U.S. at 107 n. 15, 105 S.Ct. 1785 (citing *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). Here, there was no proper notice of the rules, the burdens imposed were disproportionately distributed, and one entity was singled out to bear "public burdens which, in all fairness and justice, must be borne by the public as a whole." *Armstrong*, 364 U.S. at 49, 80 S.Ct. 1563.

All of the legislation in question here was clearly targeted at the *Atlantic Star*, as the predecessor bills to the appropriations riders indicate. As previously stated, Senator Snowe, when introducing S. 1192, referred to a "369 foot factory trawler" that was about to enter the Atlantic mackerel and herring fisheries; she was surely referring to the *Atlantic Star*. Furthermore, Congress was informed, during hearings regarding H.R. 1855, that the size prohibitions under consideration would affect only the *Atlantic Star* and no other vessels. Congressman Jack Metcalf of Washington also pointed out this fact:

> [APFC's] vessel, the *Atlantic Star*, is the only vessel that will be legislated out of existence—and into bankruptcy—by enactment of H.R. 1855. Such a result is not only bad fishery policy, it is bad Government policy and is manifestly unfair. We here in Congress should be trying to prevent Government takings of private property, not facilitating them, as this legislation most certainly does.

143 Cong. Rec. E1556–01 (1997).

The effect of the 1997 Appropriations Act was that only the *Atlantic Star*'s permits were revoked; the 1998 Appropriations Act and the 1999 Appropriations Act merely continued this legislative ban on the use of the *Atlantic Star*. The acts could not have achieved their objective any more fully if the *Atlantic Star* had been identified by name in the text of the acts. The character of the governmental action here, because that action, in both purpose and effect, was retroactive and targeted at plaintiff, supports the finding of a taking. Because the other two parts of the *Penn Central* test are also satisfied, we find that defendant took plaintiff's property interest in the use of its vessel to fish for Atlantic mackerel in the EEZ of the United States from the time the 1997 Appropriations Act was enacted until the time plaintiff sold its vessel.

## CONCLUSION

Paragraph 7 of the Supplemental Declaration of Lisa A. Kohlwes Torgersen is hereby stricken. Plaintiff's motion for summary judgment on liability is granted. Defendant's motion for summary judgment is denied. On or before May 9, 2001, the parties

shall file a joint proposed schedule for resolving remaining issues.