

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-5-2002

# Ickes v. FAA

Precedential or Non-Precedential: Precedential

Docket No. 01-2897

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Ickes v. FAA" (2002). *2002 Decisions.* Paper 475.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/475

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 5, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 01-2897

DON R. ICKES,
        Petitioner

v.

FEDERAL AVIATION ADMINISTRATION,
        Respondent

On Petition for Review From the
Federal Aviation Administration
(Admin. No. 01-030026)

Submitted Under Third Circuit LAR 34.1(a)
May 7, 2002

Before: SLOVITER, AMBRO and ROSENN, Circuit Ju dges

(Filed August 5, 2002)

OPINION OF THE COURT

PER CURIAM.

The petitioner, Don R. Ickes ("Ickes"), seeks review of an
Emergency Cease and Desist Order (the "Emergency Order")
issued by the respondent, the Federal Aviation
Administration (the "FAA"). The FAA issued the Emergency
Order to bring Ickes and his aircraft into compliance with
federal regulations and to prevent the flight of aircraft

during a weekend of fly-by demonstrations that Ickes
planned to conduct on his property in Osterburg,
Pennsylvania. Ickes claims that the FAA abused its
authority in issuing the Emergency Order because he flies
only ultralight vehicles, which, unlike aircraft, are not
subject to federal certification and registration
requirements. He also contends that the circumstances
surrounding his air show did not give rise to an emergency
so as to justify the issuance of a cease and desist order
with immediate effect. We hold that the FAA did not err in
subjecting Ickes and his aircraft to regulation or in
determining that his air show posed an exigent danger
warranting an immediate response. We will, therefore,
affirm the Emergency Order.

I.

Ickes resides in Osterburg, where he owns a thirty-eight

acre tract of land that he refers to as both "Ickes Airport" and "Ickes Recreational Park." Ickes claims to be an experienced aviator, and he has operated an airfield on the Osterburg property since at least 1987. According to Ickes, he uses the airfield solely for the recreational purpose of flying ultralight vehicles. An "ultralight vehicle" is defined in relevant part as one that

> (a) Is used or intended to be used for manned operation in the air by a single occupant; . . . and

> (e) If powered:

> (1) Weighs less than 254 pounds empty weight . . . ;

> (2) Has a fuel capacity not exceeding 5 U.S. gallons; [and]

> (3) Is not capable of more than 55 knots calibrated airspeed at full power in level flight. . . .

14 C.F.R. S 103.1 (2002). Unlike "aircraft," which can be operated only if registered under 49 U.S.C. S 44103 (1997), see 49 U.S.C. S 44101; 14 C.F.R. S 47.3, vehicles that meet the definition of an ultralight presently are not required to be registered or to bear markings of any type, are not required to meet airworthiness certification standards, and

2

their operators are not required to meet any aeronautical knowledge, age, or experience requirements or to have airman or medical certificates. 14 C.F.R. S 103.7.1 Ickes' particular contention in this proceeding is that a two-seat "Challenger II" airplane that he has flown from his property for many years qualifies as an ultralight vehicle.

The FAA, however, has repeatedly cited Ickes for his failure to register the Challenger II as an aircraft and for other regulatory infractions. Specifically, on February 25, 1992, the FAA's Eastern Regional Counsel assessed Ickes a civil penalty of $3,000 after finding that he piloted the Challenger II to and from Altoona-Blair County Airport (a short distance from Ickes' property) without an airworthiness certificate, registration, or pilot certificate. The FAA expressly found that the Challenger II must be registered as an aircraft. Notably, Ickes did not seek agency or judicial review of this order.

On May 6, 1999, the FAA's Eastern Regional Counsel then issued an emergency order to revoke Ickes' Student Pilot Certificate. Among other things, the FAA found that Ickes operated the Challenger II on numerous occasions in the latter half of 1998 in a manner that endangered life and property on the ground, including flying too low and without proper training for solo flight. The FAA concluded that Ickes lacked the "degree of care, judgment, and responsibility required of the holder of a Student Pilot Certificate." Ickes again did not seek review of the FAA

order.

On January 25, 2001, the FAA's Eastern Regional
Counsel assessed Ickes another civil penalty, this time for
$28,000, after finding that he operated the Challenger II
from October through November, 1998, without a
registration, proper markings, or an airworthiness
certificate. Once again, the FAA determined that Ickes'

_____

1. Ultralights are, nevertheless, subject to various operating restrictions.
E.g., 14 C.F.R. S 103.9(a) ("No person may operate any ultralight vehicle
in a manner that creates a hazard to other persons or property"); 14
C.F.R. S 103.15 ("No person may operate an ultralight vehicle over any
congested area of a city, town, or settlement, or over any open air
assembly of persons.").

3

Challenger II -- which it found was capable of more than
50 knots calibrated airspeed at full power in level flight,
had an empty weight of 300 pounds, a 42-horsepower
engine, and a fuel capacity in excess of 5 gallons-- was an
aircraft. Ickes did not seek further review.

Finally, between February and May, 2001, the FAA
received reports, mainly from Ickes' neighbors, that Ickes
continued to fly the Challenger II. The FAA then learned
that Ickes posted an advertisement on an Internet website
in which he invited the public to attend a gathering on his
property from June 29, 2001 through July 1, 2001. Ickes
billed the event as an "EAA Ultralight Chapter Gathering at
the Ickes Recreational Park." He promised fly-by
demonstrations as well as a "candy drop for children,"
"horseback riding," and "dirtbike trails and
demonstrations."

Upon learning of Ickes' proposed air show, and noting
Ickes' history of unlawful use of the Challenger II, the FAA
issued the Emergency Order on June 28, 2001, to preempt
Ickes' use of aircraft during the event. In particular, the
FAA required in the Emergency Order that Ickes
immediately cease and desist from operating the Challenger
II or any other aircraft until such time as he obtains
airman, airworthiness, medical, and registration
certificates; affixes appropriate identification markings to
his aircraft; and submits the aircraft to an authorized
person for appropriate maintenance inspection and
approval for service prior to operation.

Ickes timely filed a petition for review of the Emergency
Order in this Court. We have jurisdiction pursuant to 49
U.S.C. S 46110(a).

II.

Ickes presents three main arguments for our review.
First, he maintains that the Commerce Clause does not give
Congress the power to regulate his Challenger II because it

never flies across state lines. Second, he asserts that his Challenger II is an ultralight vehicle and that the FAA has improperly treated it as an aircraft. Third, he claims that no exigent circumstances existed to justify the FAA's issuance

4

of a preemptive cease and desist order. We review his constitutional claim first.

A.

Ickes argues that Congress lacked Commerce Clause authority to regulate his operation of the Challenger II, as he contends that his flights are purely an intrastate recreational activity and do not affect interstate air commerce or endanger air safety. The Supreme Court has identified three broad areas of activity subject to regulation under the Commerce Clause: (1) the use of the channels of interstate commerce; (2) protection of the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities; and (3) activities having a substantial relation to interstate commerce. United States v. Lopez, 514 U.S. 549, 558-59 (1995); see also United States v. Morrison, 529 U.S. 598, 608-09 (2000). It is beyond dispute that Congress's power over interstate commerce includes the power to regulate use of the nation's navigable airspace, which is a channel of interstate commerce. In addition, because airplanes constitute instrumentalities of interstate commerce, United States v. Bishop, 66 F.3d 569, 588 (3d Cir. 1995), any threat to them, such as the one posed by Ickes' flights of his Challenger II, is properly subjected to regulation even if the threat comes from a purely intrastate activity. See id.; see also United States v. McHenry, 97 F.3d 125, 127 (6th Cir. 1997). Ickes' constitutional challenge, therefore, is without merit.

Ickes next asserts that his Challenger II is an ultralight vehicle and that the FAA has improperly treated it as an aircraft. He also claims that no exigent circumstances existed to justify the FAA's issuance of a preemptive cease and desist order. We will address each of these arguments in turn.

B.

Ickes insists that his Challenger II is an ultralight vehicle notwithstanding the FAA's repeated findings that it is eligible for registration as an aircraft. He claims that the

5

vehicle qualifies as an "ultralight trainer" and that he is authorized to use it for instructional purposes. He contends that the plane was properly registered with Aero Sports Connection ("ASC"), a nonprofit organization that supports ultralight flying activities. The FAA granted ASC an

exemption from regulation in 1995 so that it could train and then authorize individuals to give basic flight instruction using two-seat aircraft (like the Challenger II) that would otherwise exceed the weight and speed specifications for ultralights. Ickes received instructor certification under the ASC program, and the ASC issued him an exemption to operate a two-seat aircraft for instructional purposes. Thus, Ickes contends, the FAA improperly determined that his Challenger II is an aircraft.

Our review of this purely factual question is limited. We must accept the FAA's finding as conclusive "if it is supported by substantial evidence." 49 U.S.C.S 46110(c). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . taking into account whatever in the record fairly detracts from its weight." Van Dyke v. NTSB, 286 F.3d 594, 597 (D.C. Cir. 2002) (quotation marks and citations omitted); see also Penobscot Air Services v. FAA , 164 F.3d 713, 717-18 (1st Cir. 1999) (discussing the substantial evidence standard).

It is undisputed that the Challenger II has two seats, and that fact alone removes it from the ultralight category because it is not "used or intended to be used for manned operation in the air by a single occupant." 14 C.F.R. S 103.1(a). Furthermore, Ickes does not dispute the FAA's finding (nor did he ever appeal or petition for review of the findings in the earlier FAA proceedings) that his plane has an empty weight of 300 pounds, a fuel capacity in excess of 5 gallons, and a potential cruise speed of approximately 56-69 knots. See 14 C.F.R. S 103.1(e). Thus, based on its physical characteristics, Ickes' Challenger II is not an ultralight.

As to the ASC exemption, the record reflects that Ickes' authorization to conduct ultralight training using his Challenger II expired on June 30, 2000, almost one year

6

before the FAA issued the Emergency Order.2 Ickes has failed to show that he can claim a valid exemption extending through the time when the Emergency Order was issued. The only evidence Ickes cites from the relevant period in 2001 are two letters, dated January 14, 2001 and April 16, 2001, from Bob Enos, a basic flight instructor certified by the United States Ultralight Association. The Enos letters reflect that Ickes completed a written examination demonstrating aeronautical knowledge for flight in a "Challenger II Trainer." Enos also offered an endorsement of Ickes' ability to make safe solo flights in a Challenger II for a period of 90 days from issuance of the letters. Ickes seems to suggest that, because Enos authorized him to make solo flights in a "Challenger II Trainer," the vehicle qualified as an ultralight. Reply Br. at 14.

We find nothing in the Enos letters, however, that even

arguably exempts the Challenger II from regulation as an aircraft. Although the letters referred to Ickes' plane as a "Challenger II Trainer," it is undisputed that the plane's physical and operational characteristics placed it outside the ultralight category. Moreover, Ickes has produced no evidence to show that he could claim the benefit of the ASC exemption, or any other exemption from regulation, during 2001. As such, the record fails to support his assertion that the Challenger II qualified as an ultralight trainer during that time.

In sum, while Ickes has shown that his Challenger II might have been properly deemed an ultralight trainer when his ASC exemption was in effect, we find substantial evidence to support the FAA's determination that the vehicle qualified as an aircraft when the FAA issued the Emergency Order on June 28, 2001.

_____

2. In fact, Ickes' ASC exemption may have expired or been withdrawn as early as October 5, 1998. Supplemental Appendix at 5. We will assume June 30, 2000, was the expiration date for purposes of our analysis here.

C.

Ickes next contends that his air show presented no exigent circumstances, that the FAA's treatment of the situation as an emergency was an error in judgment, and that the FAA abused its authority by issuing a cease and desist order without providing him with notice and an opportunity to be heard. According to Ickes, "[t]he grievances feeding this controversy have been primarily non-safety in nature and had accumulated [over] a one or two[-]year period." Appellant's Br. at 7. Ickes thus contends that the FAA's treatment of the situation as an emergency was an error in judgment. We reject this contention.

Contrary to Ickes' suggestion that "[t]he grievances feeding this controversy have been primarily non-safety in nature," Appellant's Br. at 7, the FAA's concerns were almost exclusively safety-related. Ickes' decision to conduct a public air show at which he intended to fly his Challenger II -- an aircraft that had not been properly registered or inspected in compliance with federal law -- raised an indisputable safety concern for the people who would attend the show, for anyone or anything on the ground within the potential flight range of that aircraft, and for any aircraft that might pass through the airspace surrounding Ickes' property. The record reveals that a low-level federal airway, identified as V469, passes immediately north of Osterburg, and a number of additional airways are within several miles of Osterburg, as are Altoona-Blair County Airport and Johnstown-Cambria County Airport, both of which receive commercial air traffic.

Moreover, Ickes had a history of endangering life and

property on the ground, as evidenced by the FAA's finding in 1999 that he operated the Challenger II in a reckless manner on numerous occasions. Ickes never sought review of that agency finding, and in fact he never formally challenged any of the numerous infractions cited in the FAA's prior orders against him. Given this record, safety was undoubtedly the FAA's predominant concern in treating the situation here as an emergency.

As to the FAA's authority to respond to an emergency, Congress has conferred broad power upon the FAA

Administrator to conduct investigations and to issue orders that the Administrator "considers necessary" to carry out the FAA's mandate. 49 U.S.C. S 40113(a). Moreover, the Administrator has the express power to act quickly and decisively in response to perceived air safety emergencies:

> When the Administrator is of the opinion that an emergency exists related to safety in air commerce and requires immediate action, the Administrator, on the initiative of the Administrator or on complaint, may prescribe regulations and issue orders immediately to meet the emergency, with or without notice and without regard to this part and subchapter II of chapter 5 of title 5. The Administrator shall begin a proceeding immediately about an emergency under this subsection and give preference, when practicable, to the proceeding.

49 U.S.C. S 46105(c). As the language of S 46105(c) suggests, the Administrator holds "broad discretion to decide when public safety concerns warrant emergency action on his [or her] part." Blackman v. Busey, 938 F.2d 659, 663 (6th Cir. 1991).

In view of this broad discretion, our standard of review when assessing an FAA response to a perceived emergency is appropriately deferential: we ask only whether the finding of an emergency " 'was a "clear error of judgment" lacking any rational basis in fact.' " Id. (quoting Nevada Airlines, Inc. v. Bond, 622 F.2d 1017, 1021 (9th Cir. 1980)). The present record reveals no clear error of judgment. The FAA duly noted the inherent public danger posed by those who operate aircraft unlawfully in this country. Ickes, moreover, had a verified history of unlawful operation of the Challenger II, the FAA had received reports in early 2001 that he continued making such flights, and Ickes' advertisement over the Internet invited the public to gather on his property for a weekend of fly-by demonstrations. It is undisputed that the demonstrations were to include the Challenger II, an aircraft that Ickes failed to have certified as airworthy or inspected by an authorized mechanic.

Ickes also did not hold a valid pilot certificate or airman medical certificate. The FAA thus had concrete information

as to specific dates on which Ickes planned to conduct unlawful flights of an aircraft, and it had a limited time in which to stop those flights so as to protect the safety of the people and property that could be harmed by Ickes' malfeasance. We conclude that Ickes' air show posed an undeniable exigent danger. We see no clear error of judgment in the FAA's invocation of its broad powers under S 46105(c) in an attempt to stop his unlawful flights.

Ickes complains that he was deprived of notice and an opportunity for a hearing before the FAA issued the Emergency Order. While FAA regulations ordinarily contemplate prior notice before the agency will issue a cease and desist order, an exception is understandably provided in the case of an emergency. See 14 C.F.R. S 13.20(b) ("Unless the Administrator determines that an emergency exists and safety in air commerce requires the immediate issuance of an order under this section, the person subject to the order shall be provided with notice prior to issuance."). Given that the FAA committed no error in deeming Ickes' air show an emergency that required an immediate response, the agency certainly did not err in foregoing prior notice pursuant to 14 C.F.R. S 13.20(b).

III.

For these reasons, we will affirm the FAA's June 28, 2001, Emergency Cease and Desist Order.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit