**AIR PEGASUS OF D.C., INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 03–60L.

United States Court of Federal Claims.

April 17, 2004.

Kathy Bailey, Bailey Law Group, Washington, D.C., for the plaintiff. Barry S. Neuman, Washington, D.C., of counsel.

Brian S. Heslin, General Litigation Section; Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, for the defendant. Kenneth Caplen, Office of the General Counsel, Federal Aviation Administration, of counsel.

## OPINION

HORN, Judge.

## FINDINGS OF FACT

Defendant, Air Pegasus of D.C., Inc. (Air Pegasus), entered into a real property lease with Steuart Investment Company in February, 1992 allowing it to operate a Heliport at 1724 South Capitol Street, S.E., Washington, D.C., from February, 1992 through October 31, 2010. The lease specified that the only permissible use of the land was for "conduct of a private use and/or public use heliport/vertiport ... and for any uses related thereto." Air Pegasus held the lease at the South Capitol Street Heliport (Heliport) until September 30, 2002.

In response to the September 11, 2001 terrorist attacks on the United States, the Federal Aviation Administration (FAA) used its emergency authority to close all aviation activity with the exception of certain military, law enforcement, and emergency related aircraft operations. Beginning September 12, 2001, all helicopters were prohibited from taking off or landing at the South Capitol Street Heliport. On September 13, 2001, the general prohibition was lifted; however, all civilian airports within a 25–nautical mile radius of Washington, D.C. were still banned from allowing aircrafts to take off or land.[1] FAA, FDC 1/9952 (2001); FAA, FDC 1/0100 (2001). Due to these restrictions, the South Capitol Street Heliport continued to be unable to permit aircraft to take off or land, even after the general prohibition was lifted on September 13, 2001.

Beginning in October, 2001, the FAA reduced certain of the restrictions on aircraft activity in the Washington, D.C. area. In October, 2001, limited flight operations were permitted to resume at Ronald Reagan Washington National Airport (DCA). See 67 Fed.Reg. 7538, 7538 (February 19, 2003); FAA, NOTAM FDC 1/0989 (2001). On December 19, 2001, the FAA decreased the area that was subject to air flight restrictions in

---

1. These restrictions were issued via "Notices to Airmen" (NOTAMs). A NOTAM is the vehicle the FAA uses to issue temporary flight restrictions when necessary for the protection of people or property.

Washington, D.C. and permitted operations at major metropolitan airports. FAA, NO-TAM FDC 1/0989 (2001). On February 13, 2002, the FAA allowed three small airports in the greater Washington metropolitan area to resume aircraft operations if they complied with specified security measures. FAA, Special Federal Aviation Regulation (SFAR) 94, 67 Fed.Reg. 7538, 7539 (2002) (request for comments), 68 FR 7684 (2003) (final rule). These airports were the College Park Airport, Potomac Airfield, and Washington Executive/Hyde Field airports. FAA, 67 Fed.Reg. 7538, 7539 (2002).

None of these FAA regulations reducing restrictions on Washington, D.C. airports allowed the South Capitol Street Heliport to resume operations. FAA, NOTAM FDC 2/1261 (2002); FAA, NOTAM FDC 2/1369 (2002), 67 Fed.Reg. 7538, 7539 (2002). The Heliport remained subject to the original prohibition on aviation activity that was put in place immediately following the terrorist attacks. *See* FAA, NOTAM FDC 1/9952 (2001); FAA, NOTAM FDC 1/0100 (2001); FAA, NOTAM FDC 1/0989 (2001).

Additional NOTAMs issued also had the direct or indirect effect of tightly controlling air operations in the area, including prohibiting operations of the South Capitol Street Heliport: (1) a December 19, 2001, NOTAM advised pilots to avoid sites such as nuclear power plants, power plants, dams, refineries, industrial complexes, and other similar facilities. FAA, NOTAM FDC 1/3359 (2001); (2) a December 19, 2001 NOTAM reissued restrictions on Instrument Flight Rules operations,[2] FAA, NOTAM FDC 2/5128 (2002); (3) a December 19, 2001 NOTAM reissued restrictions on operations to and from locations outside the United States, FAA, NOTAM FDC 1/3356 (2001); (4) a February 14, 2002 NOTAM restated a previous advisory that any commercial or private aircraft flying close to restricted or prohibited areas will be forced down by armed military aircraft, FAA, NOTAM FDC 2/1270 (2001); (5) a February 14, 2002 Special Federal Aviation Regulation set security procedures for air

flight in the Washington Metropolitan Area, FAA, NOTAM FDC 2/1256 (2002); and (6) a June 8, 2002 NOTAM restated flight restrictions on Visual Flight Rules to include avoiding certain facilities that have high security risks, FAA, NOTAM FDC 2/5167 (2002).

While these or similar regulations remain in effect, Air Pegasus cannot operate its business because helicopter flights are prohibited from taking off or landing at the South Capitol Street Heliport. Defendant has stipulated that FAA restrictions stemming from security concerns after the September 11, 2001 terrorist attacks on the United States have prevented use of the South Capitol Street Heliport. The Heliport terminated its lease and closed its business operations on September 30, 2002.

## DISCUSSION

The parties have filed cross-motions for summary judgment on the plaintiff's complaint pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed. Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson*

---

**2.** Instrument Flight Rules are rules governing procedures for planes when they are flown in weather conditions below the minimums pre-

scribed for flight under Visual Flight Rules. 14 C.F.R. § 170.03 (2003).

*v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 317 F.3d 1331 (Fed.Cir.2003); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.1997) (quoting *Conroy v. Reebok Int'l. Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate

that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v.*

*Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). After reviewing the parties' submissions, the court finds that there are no material facts in dispute to prevent resolving the case by means of summary judgment.

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of the Fifth Amendment is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). There is a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified." *Pumpelly v. Green Bay & Mississippi Canal Co.,* 13 Wall. 166, 80 U.S. 166, 179, 20 L.Ed. 557 (1871).

There exists, however, no precise analytical framework or set formula for ascertaining exactly when the impact of a government regulation requires compensation by the government. *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978). Determining whether a taking has occurred is an ad hoc factual inquiry that incorporates several factors identified by the United States Supreme Court as being particularly relevant and significant: (i) the character of the government action, (ii) the economic impact of the regulation, and (iii) the extent that the regulation interferes with reasonable investment-backed expectations. *Id.* at 124, 98

S.Ct. 2646; *see also Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 643–47, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228, *reh'g denied*, 358 U.S. 858, 79 S.Ct. 9, 3 L.Ed.2d 91 (1958).

The Supreme Court announced a *per se* rule in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), finding that a regulation depriving real property of all economic value would give rise to a taking without considering the other *Penn Central* factors delineated above. The Supreme Court qualified this rule, however, with the exception that a total loss of value would not trigger a taking if "the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with...." *Id.* at 1027, 112 S.Ct. 2886. This "antecedent inquiry" into limitations that inhere in the owner's title is made by reference to state property or nuisance law. *See id.* at 1029, 112 S.Ct. 2886. The Supreme Court also emphasized that it is proper to "permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title." *Id.* (comparing *Scranton v. Wheeler*, 179 U.S. 141, 163, 21 S.Ct. 48, 45 L.Ed. 126 (1900) with *Kaiser Aetna v. United States*, 444 U.S. 164, 178–80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)).

Subsequently, in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), the Supreme Court addressed a takings claim and focused on the reasonable investment-backed expectations prong of the *Penn Central* factors to deny a takings claim. *Id.* at 1005, 104 S.Ct. 2862. In that case, the Supreme Court relied upon the specific regulatory process that was in use by the government for evaluating data submitted to the government and found that the claimant could not validly expect that the data would be protected and not disclosed. *Id.* at 1013, 104 S.Ct. 2862. The Supreme Court, therefore, denied plaintiff's takings claim. *Id.; see also Concrete Pipe & Prods., Inc. v.*

*Constr. Laborers Pension Trust*, 508 U.S. at 645–46, 113 S.Ct. 2264.

The United States Court of Appeals for the Federal Circuit has restated the rules for a regulatory taking as follows:

> The analytical method for examining a regulatory taking claim is set forth in *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed.Cir.1994). *Loveladies Harbor* extensively reviewed the law of regulatory takings as it stood prior to the Supreme Court's decision in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and then explained the impact of *Lucas* on that body of law. As a result of this analysis, *Loveladies Harbor* described the law of regulatory takings in the following manner:
>
> a) A property owner who can establish that a regulatory taking of property has occurred is entitled to a monetary recovery for the value of the interest taken, measured by what is just compensation.
>
> b) With regard to the interest alleged to be taken, there has been a regulatory taking if
>
>> (1) there was a denial of economically viable use of the property as a result of the regulatory imposition;
>>
>> (2) the property owner had distinct investment-backed expectations; and
>>
>> (3) it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine.
>
> 28 F.3d at 1179.

*Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1379 (Fed.Cir.), *aff'd on reh'g*, 231 F.3d 1354 (Fed.Cir.), *reh'g en banc denied*, 231 F.3d 1365 (Fed.Cir.2000).

The Federal Circuit continued with a description of a categorical taking:

> Subsequently, again citing *Lucas*, this court explained in *Florida Rock Indus. v. United States*, 18 F.3d 1560 (Fed.Cir.1994), that "[i]f a regulation categorically prohibits *all* economically viable use of the land—destroying its economic value for private ownership—the regulation has an effect

equivalent to a permanent physical occupation. There is, without more, a compensable taking." *Id.* at 1564–65. *Florida Rock* went on to point out that even when the taking is considered "categorical," *Lucas* preserved for the Government a nuisance defense to such a taking claim. *See id.* at 1565 n. 10. Thus, when the analysis of prong (1) reveals that the regulatory imposition has deprived the owner of *all* economically viable use of the property (a "categorical taking"), then the only remaining issue is the Government's defense under prong (3).

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1379 (emphasis in original; footnote omitted);[3] *accord Cienega Gardens v. United States,* 265 F.3d 1237, 1244 (Fed.Cir. 2001) (stating, regulatory takings may occur "when government action, although not encroaching upon or occupying private property, still affects and limits its use to such an extent that a taking occurs.") (citing *Palazzolo v. Rhode Island,* 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)); *John R. Sand & Gravel Co. v. United States,* 60 Fed. Cl. 230, 234 (2004) (quoting *Cienega Gardens v. United States,* 265 F.3d at 1244). In response to the petition to the Federal Circuit for rehearing in *Palm Beach Isles,* the Federal Circuit reconsidered whether, if a taking is categorical, "that determination removes from the analytical equation the question of investment-backed expectations." *Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1357. On rehearing, the Federal Circuit reaffirmed its earlier determination. When a regulatory taking is categorical, the property owner will recover without any consideration of investment-backed expectations, as in a physical taking. *Id.* at 1364; *cf. Palm Beach Isles Assocs. v. United States,* 231 F.3d 1365, 1367–70, 1373 (Fed.Cir.2000) (Gajarsa, J., dissenting, in the denial of the petition for rehearing *en banc*). Any such recovery, however, remains subject to the third prong of the regulatory takings test—government defenses subsumed within the nuisance doctrine.

Plaintiff contends that it has suffered a compensable taking at the hands of the FAA. Defendant responds that there has been no demonstration of a categorical taking, in other words, the removal of all economic value by the regulatory imposition, since the plaintiff was able to operate the Heliport for part of the time period covered by the lease. However, even if the court were to conclude that the FAA regulation did remove all economic value, defendant is permitted to argue as a defense that the plaintiff's interest was within the power of the federal government to regulate under common law nuisance principles. Under the facts of the case currently before the court the defendant has presented a complete defense to a taking.

In order for the government's actions to constitute an unconstitutional taking, the plaintiff must have a protected property right. As stated in *M & J Coal Co. v. United States,* "[f]irst, a court should inquire into the nature of the landowner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with, *i.e.,* whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner. *Lucas,* [505] U.S. at [1027], 112 S.Ct. at 2899." *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995); *see also John R. Sand & Gravel Co. v. United States,* 60 Fed.Cl. at 234 (2004) (stating, "[t]he first step in analyzing both physical and regulatory takings claims is to determine whether a claimant has a property interest.").

If a party voluntarily enters into an area that is subject to pervasive government control, then a property right that would justify compensation under the Takings Clause may

---

**3.** On rehearing, the Federal Circuit in *Palm Beach Isles* provided a further description of a categorical taking:

> A "categorical" taking is, by accepted convention, one in which *all* economically viable use, i.e., all economic value, has been taken by the regulatory imposition. Such a taking is distinct from a taking that is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use.

*Palm Beach Isles Assocs. v. United States,* 231 F.3d at 1357 (emphasis in original).

not exist. *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994); *see also Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 55, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). "The reason 'enforceable rights sufficient to support a taking claim' cannot arise in such an area [an area voluntarily entered into and subject, from the start, to pervasive government control] is that when a citizen voluntarily enters such an area, the citizen cannot be said to possess 'the right to *exclude*'." *Mitchell Arms, Inc. v. United States*, 7 F.3d at 216 (*quoting Hendler v. United States*, 952 F.2d 1364, 1374 (Fed.Cir.1991) (emphasis in original)). The United States Supreme Court stated this proposition as follows:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. [393,] 413, 43 S.Ct. 158, 67 L.Ed. 322 [ (1922) ].

*Lucas v. South Carolina Coastal Council*, 505 U.S. at 1027, 112 S.Ct. 2886 (footnote omitted); *accord Connolly v. Pension Benefit Guar., Corp.*, 475 U.S. at 227, 106 S.Ct. 1018 (stating, "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.") (*quoting FHA v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), *reh'g*

*denied*, 358 U.S. 937, 79 S.Ct. 310, 3 L.Ed.2d 311 (1959)).

The inquiry required to determine if a takings claim fails because the plaintiff voluntarily entered into a highly regulated field, is whether the "interest affected was 'totally dependent' upon the Government's regulatory power or 'inherent' in the ownership rights of the plaintiff." *Maritrans Inc. v. United States*, 40 Fed.Cl. 790, 795 (1998) (footnote and citation omitted); *accord Mitchell Arms, Inc. v. United States*, 7 F.3d at 217 (discussing that a property interest that was a " 'collateral interest' incident to Mitchell's [plaintiff] ownership of the rifles is not property protected by the Fifth Amendment."); *Page v. United States*, 51 Fed.Cl. 328, 339 (2001) (stating, "[m]ere participation in a heavily regulated environment does not bar a plaintiff from any possibility of showing that it has a property interest compensable under the Fifth Amendment. Rather, courts must consider whether the affected 'right of use' is dependent upon the regulatory scheme or whether 'an independent or preexisting right of use under common law applies.' ") (*quoting Maritrans Inc. v. United States*, 40 Fed.Cl. at 798) (citation omitted), *aff'd*, 50 Fed.Appx. 409 (2002), *reh'g and reh'g en banc denied* (2003); *American Pelagic Fishing Co. v. United States*, 49 Fed.Cl. 36, 47 (2001) (stating, "[t]o determine whether a property right exists independent of the regulatory scheme, it is necessary to decide 'whether an independent or preexisting right of use under common law applies.' ") (*quoting Maritrans Inc. v. United States*, 40 Fed.Cl. at 798).

In *United Nuclear Corporation v. United States*, the Federal Circuit found that a taking had occurred and a property interest compensable under the Fifth Amendment by concluding that the interest was independent of the regulatory scheme. United Nuclear Corporation (United) had entered into leases with the Navajo Tribal Council authorizing United to conduct mining on the Navajo Reservation. *United Nuclear Corp. v. United States*, 912 F.2d 1432, 1433 (Fed.Cir.), *reh'g denied and suggestion for reh'g en banc declined* (1990). These leases and exploration plans had been approved by the Secretary of

Interior. *Id.* However, when United sought to begin mining, the Secretary would not approve the mining plan until the Tribe first approved it. *Id.* The Tribe did not approve it within a three year period, and, therefore, "United's leases terminated because United failed to begin mining within the period the lease specified." *Id.* The Federal Circuit found a property interest in the *United Nuclear Corporation* case because the leasehold in the minerals was "held *independent* of their denied permits." *Mitchell Arms Inc. v. United States,* 7 F.3d at 217 (quoting *Mitchell Arms, Inc. v. United States,* 26 Cl.Ct. 1, 6 (1992) and discussing the *United Nuclear* case) (emphasis in original). United's property interest was the "leasehold interest in the minerals, which the government took by preventing United from mining under the leases, and not the mere expectation that United would be permitted to engage in mining." *United Nuclear Corp. v. United States,* 912 F.2d at 1437. The court, therefore, found that "the Secretary's refusal to approve the mining plan seriously interfered with United's investment-backed expectations by destroying them." *Id.*

In contrast, courts have found property interests to be dependent on a regulatory scheme when pervasive regulation exists in the area. For example, in *Bowen v. Public Agencies Opposed to Social Security Entrapment,* the Supreme Court found that no property interest existed in a case in which the State of California voluntarily entered into the Social Security Program to provide coverage for their employees, and then was prevented from terminating its participation due to an act of Congress. *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. at 55, 106 S.Ct. 2390. At the time the State of California entered the system, section 418 of the Social Security Act, 42 U.S.C. § 418 (1982 ed. Supp. II), allowed any state to terminate its participation in the program with two years notice; California's agreement with the federal government contained the same provision. *Id.* at 45, 106 S.Ct. 2390. Later, due to concerns that numerous withdrawing states would threaten the program's integrity, Congress amended the statute to remove the termination provisions and prevent states from withdrawing

employees from the system. *Id.* at 48, 106 S.Ct. 2390. The plaintiffs claimed that the removal of the termination provisions was a taking of California's contractual rights to end the agreement. *Id.* at 50, 106 S.Ct. 2390. The Supreme Court held that:

> The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in § 418 itself. The provision constituted neither a debt of the United States, nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium.... Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare. Under these circumstances, we conclude that the termination provision in California's § 418 Agreement did not rise to the level of "property."

*Id.* at 55, 106 S.Ct. 2390 (citations omitted).

In *Conti v. United States,* the court found that no property interest under the Fifth Amendment existed to benefit a fisherman who had fished with gillnets under permit, but whose right to do so was curtailed due to a new regulation banning gillnets. *Conti v. United States,* 48 Fed.Cl. 532, 540 (2001), *aff'd,* 291 F.3d 1334 (Fed.Cir.2002), *cert. denied,* 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003). The court stated that a "plaintiff's reliance on his permit cannot confer a property interest upon him." *Id.* at 538. In addition,

> a private property interest is generally not revocable or alterable by another party. The NMFS [National Marine Fisheries Service], however, retains power to alter the terms and conditions of plaintiff's permit by banning any type of gear, vessels, or equipment. The NMFS may "prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment ..." 16 U.S.C. § 1853(b)(4) (2000), as well as revoke or deny a permit for violations of permit conditions, regulations, or statutes. Plaintiff's permit is thus subject to the NMFS' power to alter its terms. The

Supreme Court has held that the power to "alter, amend, or repeal" a statutory provision means there is no property interest in the continuation of the provision's current form.

*Conti v. United States,* 48 Fed.Cl. at 538 (citing *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. at 52, 106 S.Ct. 2390) (footnote and citation omitted).[4]

In the present case, the discussion centers around whether there is an inherent property interest to use navigable airspace above owned or leased property.[5] The plaintiff does not dispute that the United States has exclusive sovereignty over United States airspace. *See* 49 U.S.C. § 40103(a) (2000) (stating, "Sovereignty and public right of transit.—(1) The United States Government has exclusive sovereignty of airspace of the United States."). At the time Air Pegasus entered into the lease in question, the Heliport already was subject to numerous FAA regulations. The airspace above much of Washington, D.C. had been designated by the FAA as prohibited airspace since at least January 2, 1981. *See* 64 Fed.Reg. 13334 (Mar. 18, 1999). Also, Washington, D.C. airspace was subject to certain minimum requirements for pilots and aircraft due to its classification as "Class B airspace."[6] 14 C.F.R. § 71.41 (2003). For Air Pegasus, this meant that any aircraft taking off and landing at the South Capitol Heliport had to follow Class B airspace rules and remain clear of the prohibited airspace in Washington, D.C.

At the time Air Pegasus signed the lease to operate the South Capitol Heliport, it voluntarily entered into a business over which the United States has exclusive sovereignty, 49 U.S.C. § 40103(a), in a geographic area subject to a high degree of federal regulation. As noted by the United States Supreme Court:

> Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands.... Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone ....

*Northwest Airlines, Inc. v. State of Minnesota,* 322 U.S. 292, 303, 64 S.Ct. 950, 88 L.Ed. 1283 (Jackson, J., concurring), *reh'g denied,* 323 U.S. 809, 65 S.Ct. 26, 89 L.Ed. 645 (1944); *accord United States v. Causby,* 328 U.S. 256, 261, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (stating, "[t]he air is a public highway, as Congress had declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits.").

The choice made by Air Pegasus to operate a heliport business in an area which is, and traditionally has been, highly regulated

---

4. The court notes, but is not persuaded or precedentially bound, by the conclusion reached in *American Pelagic Fishing Company, L.P. v. United States,* 49 Fed.Cl. 36 (2001), in which plaintiff alleged a taking as a result of congressional legislation resulting in a taking of all economically beneficial use of the ship. In that case, a taking in the right to use plaintiff's fishing vessel to fish the type of fish for which it was built in a particular geographic area was found by the court. Moreover, the court found that it was "not confronted here with a property or a use which is inherently dangerous or a nuisance," *id.* at 47, which presents a fundamental difference from the case at bar.

5. Leases are compensable property interests within the meaning of the Takings Clause of the Fifth Amendment. As the United States Supreme Court has stated, property

> [d]eals with what lawyers term the individual's "interest" in the thing in question. That interest may comprise the group of rights for which the shorthand term is "a fee simple" or it may be the interest known as an "estate or tenancy for years" .... The constitutional provision is addressed to every sort of interest the citizen may possess.

*United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945). In *United States v. General Motors Corp.,* the Supreme Court held that a right of temporary occupancy of a building was property under the Fifth Amendment. *Id.* at 380, 65 S.Ct. 357; *accord Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 769, 572 F.2d 786, 818 (1978) (stating, "[a]s a general proposition, a leasehold interest is property, the taking of which entitles the leaseholder to just compensation for the value thereof.").

6. Areas that are Class B airspace typically surround large airports or cities. 14 C.F.R. § 71.41 (2003).

is analogous to the State of California's choice to enter the Social Security System in *Bowen.* In both cases, the party in question voluntarily entered a regulatory scheme with knowledge that the government "retained authority to amend in the exercise of its power to provide for the general welfare." *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. at 55, 106 S.Ct. 2390. Additionally, the present case is analogous to *Conti* in which no property interest was found by the court because the plaintiff chose to operate a business subject to a federal regulatory program over which the government retained the ability to alter and amend existing regulations. *Conti v. United States,* 48 Fed.Cl. at 538–39. Similarly, in the present case, the FAA necessarily retains broad authority to instantly alter air flight requirements through NOTAMs. Air Pegasus entered this highly regulated area, in Washington D.C., with the knowledge that the government reserved the power, and indeed regularly exercised its power, to restrict air flight patterns and procedures.

As noted earlier, the third prong of the test for a compensable regulatory taking is concerned with common law nuisance doctrine. The United States Court of Appeals for the Federal Circuit has stated that: "The common law of nuisance makes unlawful certain conduct by property owners, and the State may convert these implicit background principles into explicit laws without thereby effecting a taking." *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1383 (citing *Lucas v. South Carolina Coastal Council,* 505 U.S. at 1030, 112 S.Ct. 2886). In order to assert a defense to a takings claim

[t]he Government must "identify background principles of nuisance and property law that prohibit the uses he now intends in the circumstances in which the property is presently found. Only on this showing can the State fairly claim that, in proscribing all beneficial uses, the [regulatory action] is taking nothing."

*Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1383 (quoting *Lucas v. South Carolina Coastal Council,* 505 U.S. at 1031–32, 112 S.Ct. 2886) (alteration in original). Navigable water was the subject matter in

*Palm Beach Isles,* and the Federal Circuit concluded that, although much of the discussion in *Lucas* focused on property rights as defined by state law, the federal navigable servitude over waterways could be a defense to a regulatory taking. *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1383 ("Thus, the Supreme Court seems to suggest that, though much of the discussion in *Lucas* focused on property rights as defined by state law, the United States Government could assert the federal navigational servitude as a defense against a regulatory takings claim."). "In light of our understanding of *Lucas* and the other cases we have considered, we hold that the navigational servitude may constitute part of the 'background principles' to which a property owner's rights are subject and, thus, may provide the Government with a defense to a takings claim. As noted by the Supreme Court, the navigational servitude is 'a pre-existing limitation on the landowner's title.'" *Id.* at 1384 (quoting *Lucas v. South Carolina Coastal Council,* 505 U.S. at 1028–29, 112 S.Ct. 2886). The navigable servitude discussed in *Palm Beach Isles* "derives from the Commerce Clause of the Constitution, and gives the United States Government a 'dominant servitude'—a power to regulate and control the water of the United States in the interest of commerce." *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1382 (citing *United States v. Rands,* 389 U.S. 121, 122–23, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967) (footnote omitted)).

While *Palm Beach Isles* dealt with navigable waterways, the present case deals with navigable airways. There are similarities between the two. In *Braniff Airways,* the United States Supreme Court discussed the Civil Aeronautics Act of 1938, 52 Stat. 977, 1028, § 1107(i)(3), 49 U.S.C. § 176(a), which provided for complete and exclusive national sovereignty over the navigable airways. *Braniff Airways, Inc. v. Nebraska State Bd.,* 347 U.S. 590, 594–95, 74 S.Ct. 757, 98 L.Ed. 967, *reh'g denied,* 348 U.S. 852, 75 S.Ct. 18, 99 L.Ed. 671 (1954). The Court noted that this concept of federal sovereignty over the airways originated earlier, with the Air Commerce Act of 1926, 44 Stat. 568, 572, § 6. *Id.* at 595, 74 S.Ct. 757. The Supreme Court stated that the legislation regulating "air

commerce" emanated from the commerce power of Congress. *Id.* at 596, 74 S.Ct. 757. In this regard, the House Report accompanying the bill which became the Air Commerce Act of 1926, stated:

> The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes navigable or non-navigable waters. The public right of flight in the navigable air space owes its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil. H.R.Rep. No. 572, 69th Cong., 1st Sess., p. 10.

*Braniff Airways, Inc. v. Nebraska State Bd.,* 347 U.S. at 596–97, 74 S.Ct. 757.

The United States Court of Claims also compared navigable waters to navigable airways in the *Bydlon* case. The court began with the proposition that a property owner has a right of access to an adjacent navigable stream, but the right of access is subject to the dominant servitude of the United States to take all necessary steps to improve navigation. *See Bydlon v. United States,* 146 Ct.Cl. 764, 768, 175 F.Supp. 891, 892 (1959). Continuing, the *Bydlon* court wrote:

> The air space over the United States is also a public highway .... As in the case of navigable waters, the nation has a dominant servitude in the air for the purpose of air commerce. It gets this servitude over the air, as it does over navigable waters, from the provision in the Constitution giving it the power to regulate interstate and foreign commerce.

*Bydlon v. United States,* 146 Ct.Cl. at 769, 175 F.Supp. at 893 (citing *Braniff Airways, Inc. v. Nebraska State Bd.,* 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967 (1954)); *see also City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 626, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) (discussing the Federal Aviation Act of 1958, 72 Stat. 731, § 1108(a), 49 U.S.C. 1508(a), which also provided for complete and exclusive national sovereignty over the navigable airspace by the federal government and the broad authority of the federal government to regulate that airspace); *Ickes v. FAA,* 299 F.3d 260, 263 (3d Cir.2002) ("It is beyond dispute that Congress's power over interstate commerce includes the power to regulate use of the nation's navigable airspace, which is a channel of interstate commerce."); 49 U.S.C. § 40103(a)(1) (2000) ("The United States Government has exclusive sovereignty of airspace of the United States.").

In 1944, the United States Supreme Court concluded that "[w]e are at a stage in development of air commerce roughly comparable to that of steamship navigation in 1824 when *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23, came before this Court." *Northwest Airlines, Inc. v. Minnesota,* 322 U.S. 292, 302, 64 S.Ct. 950, 88 L.Ed. 1283, *reh'g denied,* 323 U.S. 809, 65 S.Ct. 26, 89 L.Ed. 645 (1944). The Supreme Court continued:

> Today the landowner no more possesses a vertical control of all the air above him than a shore owner possesses horizontal control of all the sea before him. The air is too precious as an open highway to permit it to be "owned" to the exclusion or embarrassment of air navigation by surface landlords who could put it to little real use.
>
> Students of our legal evolution know how this Court interpreted the commerce clause of the Constitution to lift navigable waters of the United States out of local controls and into the domain of federal control. *Gibbons v. Ogden,* 9 Wheat. 1, 6 L.Ed. 23 [1824], to *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 [1940]. Air as an element in which to navigate is even more inevitably federalized by the commerce clause than is navigable water....
>
> Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive.

*Northwest Airlines, Inc. v. Minnesota,* 322 U.S. at 303, 64 S.Ct. 950 (alterations added).

The case law indicates that federal dominance of both United States waterways and United States airways is long standing. In

this regard, the court concludes that navigable airways are similar to navigable waterways with regard to the presence of complete and pervasive federal dominance. A property owner's rights are subject to background principles of nuisance and property law, which serve as pre-existing limitations on those rights, providing a complete defense to a takings claim. *Palm Beach Isles Assocs. v. United States,* 208 F.3d at 1383–84. In the present case, although the FAA's regulatory activity may have had an adverse impact on the plaintiff's heliport business, a compensable regulatory taking did not arise from the limitations on plaintiff's business caused by the regulatory activity.

Plaintiff cites *United States v. Causby* to argue that the government's use of air space can lead to a taking. *See United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). However, the Supreme Court in *Causby* clearly stated that there is no property right to navigable airspace. *Id.* at 261, 66 S.Ct. 1062 ("The air is a public highway, as Congress has declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits."). The property interest the court found to exist was the right to habitable land; not the right to the use of the navigable airspace above it. *Id.* ("[I]f the flights over respondents' property rendered it uninhabitable, there would be a taking compensable under the Fifth Amendment.").

Plaintiff also relies on *Palazzolo v. Rhode Island* to support its allegations of a taking and to counter that a takings claim cannot be barred by the sole fact that the landowner purchased property with knowledge of an existing regulatory program. *See Palazzolo v. Rhode Island,* 533 U.S. at 627, 121 S.Ct. 2448. The United States Supreme Court in *Palazzolo,* however, does not assert such a broad proposition. Rather, the Supreme Court indicated that a takings claim is not absolutely barred by advance knowledge of a regulatory scheme because in some cases the regulatory power "is so unreasonable or onerous as to compel compensation." *Id.* at 627, 121 S.Ct. 2448. In the instant case, the regulatory scheme certainly is not unreasonable. The particular NOTAMs which result-

ed in flights from the plaintiff's Heliport being banned were issued due to national security concerns after the terrorist attacks on September 11, 2001. Washington, D.C. is the nation's Capitol and a highly populated area. Given the level of terrorist activity and threats throughout the world, this court believes that restricting the airspace within such close proximity to the White House, the Capitol, and the Pentagon, which was previously attacked, is not only reasonable, but also is appropriate and responsible.

## CONCLUSION

Air Pegasus voluntarily chose to conduct a heliport business in the Washington, D.C. metropolitan area. Any business associated with the airline business is under sovereign control by the United States government and activities within the Washington, D.C. geographic area are subject to pervasive regulation. No property right exists to public navigable airspace. Therefore, no property right over the navigable airspace above the leased area at the South Capitol Street Heliport can attach to the lessee, Air Pegasus. Because a Fifth Amendment taking cannot be found without a compensable property interest, a taking has not occurred. The plaintiff's motion for summary judgment is, hereby, **DENIED**, and the defendant's motion for summary judgment is **GRANTED**. The clerk's office shall **DISMISS** plaintiff's complaint, with prejudice, and enter **JUDGMENT** for the defendant.

**IT IS SO ORDERED.**